UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

UNITED STATES,

                                     **MEMORADUM & ORDER**
                                          12-CR-357-2 (DRH)
        -v.-                          17-CV-7336 (DRH)

DIANE KAYLOR,

                      Defendant.

_____

**HURLEY**, Senior District Judge:

        Presently before the Court is the Section 2255 petition of Diane Kaylor ("Defendant"),

claiming ineffective assistance of counsel.  For the reasons described below, the petition is

denied in its entirety.

## BACKGROUND

*I.     Evidence at Trial*

        Defendant seeks to challenge a judgment entered against her on July 19, 2016.

(Judgment as to Diane Kaylor [ECF No. 459] at 1 et seq.)  The evidence at trial demonstrated

that Defendant, together with her boss Nicholas Cosmo ("Cosmo"), four other individual

defendants, and numerous other parties, participated in a large-scale Ponzi scheme at Agape

World, Inc. ("Agape").  (*See, e.g.*, Tr. at 2922–23.)  Agape held itself out to investors as a

company providing short-term bridge loans to commercial borrowers.  (*Id.*)  Defendant was

employed by Agape first as a bookkeeper, from Fall 2005 to Fall 2007, and later as an account

representative/broker, from February 2006 until Agape was shuttered in 2009.  (*Id.* at 2072–78.)

Prior to working for Agape, Defendant earned a college degree in marketing, though she took

several classes on business and finance, and then worked for an accounting firm as a bookkeeper.

(*Id.* at 2080–81.)

When Defendant switched positions, she trained the bookkeeper who succeeded her, a woman named Shamika Luciano ("Luciano"). (*Id.* at 2086, 2087–88.) Luciano testified that in her first month of employment at Agape she already knew that "Agape was engaged in fraudulent conduct," which she learned by "doing the banking" that Defendant had done before her and taught her how to do. (*Id.* at 2075–75.) Luciano had no prior education or experience in finance. (*Id.* at 2077.) Luciano explained how one transaction that had occurred while Defendant was in charge of the bookkeeping showed that Agape raised $52 million for one loan, even though the contract and the bank statement showed that the loan was only for $4.6 million. (*Id.* at 2091–92.) The implication was that Defendant would have seen this discrepancy by simply doing her job.

As an account representative, Defendant was responsible for raising money from investors. (*Id.* at 2148–50.) Investors were told that Agape would use the money to fund specific bridge loans, and that the investments were extremely low-risk. (*Id.* at 517–18.) The millions of dollars raised for these purported loans were almost exclusively used instead to prop up the Agape Ponzi scheme and to pay for extravagances on the part of Cosmo and his team, such as Cosmo's purchase of a paintball arena. (*See, e.g.*, *id.* at 532.) Agape maintained "binders" for each of its bridge loans, which provided the "name of the contract, the location, the term [of the loan], and the dollar amount." (*Id.* at 2139.) Both Luciano and another witness, Richard Barry (who worked at Agape as a bridge loan originator), testified that they observed Defendant reviewing loan binders on at least one occasion each. (*Id.* at 2142–43.) The government introduced evidence regarding one of the loan binders, which showed on the spine of the binder that the loan was for $1.1 million. (*Id.* at 2142–43.) Defendant herself raised $2.8

million for this loan, and the Agape representatives together raised a total of $57 million for this loan. (*Id.* at 2148–50.) Luciano testified that Defendant was responsible for reviewing the bank statements during the time period relevant to this loan. (*Id.* at 2149.) In other words, she would have seen the amount of money coming in that was raised for the loan, and the amount of money going out to fund the loan. Defendant was also responsible for collecting, calculating, and depositing checks from brokers at one point during her tenure with Agape. (*Id.* at 812.)

In July of 2008, Defendant and the other brokers were no longer being paid commissions for the funds they raised because there was not enough money in the Agape account. (*Id.* 2228–30.) Around this time, Agape also asked its employees to lend money to the company. (*See, e.g.*, *id.* at 531–44.) Defendant continued to solicit investment funds from individuals, and she did so without informing the investors of Agape's dire financial situation. (*Id.* at 543–44; 1150–51.) At some time in or before August 2008, Defendant also learned that her boss, Cosmo, had previously been convicted of defrauding investors in 1999 and had been sentenced to 21-months' imprisonment. (*Id.* at 2203–08.) Defendant did not tell most of her clients that Cosmo was a convicted felon, even after she indisputably was aware of that information. (*Id.* at 531–32.)

On November 3, 2008, Cosmo sent an e-mail to Agape employees, including Kaylor, explaining that "the firm is now on extension/default on every loan we did last year" and "immediate efforts need to be placed on your current client base and we need to raise money." (*Id.* at 1005.) The e-mail further provided that anyone sharing it "will be terminated." (*Id.* at 1006.) One investor, Henry Czarnicki, testified that in December 2008, Defendant informed him that an investment of $22,000 with Agape was "low risk" and that the financial well-being of the company was "very strong." (*Id.* at 1149, 1167.)

On January 26, 2009, Cosmo was arrested for the Agape Ponzi scheme. (*Id.* at 2253–55.)

That same day, Defendant unsuccessfully attempted to deposit two commission checks in the amount of $293,340 and $72,266. (*Id.*) Both checks bounced. (*Id.* at 2255–56.) Defendant now claims that she deposited the checks on her counsel's advice. (Def.'s Mem. in Supp. [ECF No. 518-1] at 2.) When the Agape Ponzi scheme finally collapsed in 2009, it caused an aggregate loss of approximately $179 million to its investors.

## II. Defendant's Arrest, Sentencing, and Appeal

On March 12, 2009, Defendant met with the government pursuant to a proffer agreement. Thereafter, Defendant was arrested on April 25, 2012. The final charging instrument, the Fourth Superseding Indictment, charged Defendant with one count of securities fraud, one count of conspiracy to commit mail and wire fraud, five counts of mail fraud, and three counts of wire fraud. (Superseding Indictment [ECF no. 283] at 1 (Feb. 25, 2015).) The trial against Defendant and one of her co-conspirators commenced on March 17, 2015. Defendant was ultimately convicted of all ten counts: one count of securities fraud, one count of conspiracy to commit mail and wire fraud, five counts of mail fraud, and three counts of wire fraud. (Judgment at 1–2.) Defendant was sentenced on July 15, 2016, to seventy-eight months in prison, to run concurrently, on counts one through ten, followed by three years of supervised release, to run concurrently, on counts one through ten. (Criminal Cause for Sentence [ECF No. 458] at 1.) The Court also imposed the following Restitution Order and forfeiture obligation: (1) Defendant must make full financial disclosure to the Probation Department; (2) Defendant shall not engage in any employment which involves soliciting or handling client funds; (3) Defendant shall not possess a firearm; and (4) Defendant must pay restitution in the amount of $179,195,232.63, payable at a rate of $25 per quarter while in custody and a rate of 10% of gross income per month while on Supervised Release. (*Id.*)

Defendant timely appealed on August 1, 2016. On October 26, 2016, Defendant filed an Amended Motion for bail pending appeal and for a stay of surrender pending final resolution. (Am. Motion to Continue [ECF No. 478.] In this motion, Defendant asserted that her trial counsel was ineffective on two grounds and that this was a substantial issue that merited bail pending appeal. (Mem. in Supp. [ECF No. 479] at 6–10.) The Court issued an Order on December 6, 2016, denying Defendant's motion on the ground that the evidence against her was overwhelming and accordingly any deficient performance by her counsel had not prejudiced her. (Order Denying Motion to Modify Conditions of Release [ECF No. 487] at 1 et seq.) Finally, after several requests for extensions of time to file her appellate brief, Defendant withdrew her appeal on May 11, 2017.

III.      *Defendant's Subsequent Petition*

Defendant filed the instant § 2255 Petition on December 16, 2017, again claiming ineffective assistance of counsel. (Section 2255 Petition [ECF No. 518] at 1.) Specifically, Defendant challenges her trial counsel's following nine actions:

(1) Failure to call Defendant's previous employer as a witness, "who would have testified that Defendant's duties at his accounting firm were ministerial and that she lacked the basic facilities with accounting and finance concepts to discover that Agape was a fraud, which was critical to her defense;"

(2) Stipulation to the admission of Defendant's draft resume for the truth of its contents, which apparently undermined her defense that she was unaware of the fraud and permitted the government to argue that "her 'accounting' (actually, simple bookkeeping) experience and 'business' (actually, marketing) degree would have made her aware of it;"

(3) Failure to object to testimony about the contents of Defendant's draft resume and college transcript;

(4) Failure to introduce e-mails between Defendant and Cosmo;

(5) Failure to object to improper testimony by the government's expert witness, Arthur Laby, that the bridge loans in questions were securities;

(6) Failure to object to the government's argument to the jury that purported omissions by Defendant to investors were sufficient to convict her of fraud without establishing that she had a duty to disclose the omitted information;

(7) Failure to introduce e-mails demonstrating that Defendant allegedly disclosed to investors the same information the government alleged she omitted;

(8) Failure to move for a change of venue, given that the Agape fraud was highly publicized; and

(9) Operation under an "unwaivable conflict of interest" because immediately after Cosmo's arrest, Defendant's counsel advised her "that she could deposit commission checks she had received, which the government used to establish her consciousness of guilt at trial."

(Def.'s Mem. in Supp. at 1–2.)

## DISCUSSION

I.    *Section 2255 Legal Standard*

Under 28 U.S.C. § 2255, a prisoner in federal custody may petition a federal court to vacate, set aside, or correct his or her sentence. Relief under § 2255 is available to rectify constitutional errors, a lack of jurisdiction in the sentencing court, "an error of law or fact that constitutes a fundamental defect which inherently results in [the] complete miscarriage of

justice," or another ground for collateral attack. *See Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996). This standard is strictly construed to recognize that collateral attacks on criminal convictions are in "tension with society's strong interest in [their] finality." *Ciak v. United States*, 59 F.3d 296, 301 (2d Cir. 1995)) (alterations in original).

"[T]he filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing; that section does not imply that there must be a hearing where the allegations are 'vague, conclusory, or palpably incredible." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013). Rather, the Second Circuit has established that courts may pursue a "middle road" of deciding disputed facts on the basis of written submissions. *Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011).

## II. Ineffective Assistance of Counsel Legal Standard

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that to prevail on an ineffective assistance of counsel claim, a petitioner must establish that his counsel: (1) performed deficiently, and (2) that the deficiency caused actual prejudice to his defense. *Id*. at 687; *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002).

Under the first prong, the court must "indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. The petitioner may prove the deficiency prong by establishing that his attorney's conduct fell "outside the wide range of professionally competent assistance." *Id*. at 690. "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). The courts must "bear[] in mind that '[t]here are countless ways to

provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 690–91) (alterations in original).

Under the second prong, the petitioner may establish prejudice by showing that a "reasonable probability" exists that, but for the deficiency, "the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is one sufficient to undermine confidence in the outcome of the trial or appeal." *Dunham*, 313 F.3d at 730. *Strickland's* prejudice requirement reflects a defendant's burden to overcome the "presumption of reliability" ordinarily afforded to "judicial proceedings." *Roe v. Flores-Ortega*, 528 US. 470, 482 (2000).

Although the test for ineffective assistance of counsel contains two prongs, the Supreme Court specifically noted that district courts need not address both components if a petitioner fails to establish either one. The relevant excerpt from that decision reads:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

466 U.S. at 697. Since the two *Strickland* requirements are conjunctively stated, the failure to establish either is fatal. Finally, the Court notes that the "*Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).

*III.    Petitioner's § 2255 Petition is Denied*

As delineated above, Defendant sets forth nine grounds that she argues constitute ineffective assistance of counsel.  The Court will analyze each of these in turn, and will then consider the cumulative impact of all the purported errors taken together.

A.  Failure to Call Defendant's Previous Employer as a Witness

Defendant argues that her trial counsel was ineffective because he failed to call her previous employer as a witness.  (Def.'s Mem. in Supp at 1.)  This person allegedly "would have testified that Defendant's duties at his accounting firm were ministerial and that she lacked the basic facilities with accounting and finance concepts to discover that Agape was a fraud, which was critical to her defense[.]"  (*Id.*)  Defendant further states that had her "trial counsel called [] Ainbinder as a witness, the jury would have learned that [Defendant], at best, had only the must rudimentary understanding of financial matters."  (*Id.* at 20.)

As an initial matter, the Court notes that it has already considered and rejected this same argument in its December 6, 2016 Order.  (Order Denying Defendant's Motion to Modify the Conditions of Release at 3–4.)  The Court held the following:

> The gravamen of the prosecution's argument as to Defendant's accounting experience focused on Defendant's position as Agape World's sole bookkeeper for the two years immediately prior to her becoming an account executive.  That circumstance alone essentially compels the conclusion that she was knowledgeable (1) as to the source of the monies deposited into the corporation's bank account as well as the nature of the withdrawals from that account, and (2) that the recorded entries were fundamentally at odds with the business model as explained to the corporate investors.  Indeed, her successor as corporate bookkeeper, Shamika Luciano—who was trained by Kaylor (Tr. at 2086, 2087–88) and had no prior education or experience in finance (*id.* at 2077)—realized within the "first month" that Agape World's operations were fraudulent (*id.* at 2074–75).  It was obvious to Luciano that the corporation was receiving millions of dollars from investors who were led to believe that their monies were being used to fund specific bridge loans whereas, in fact, those sums were being diverted to, *inter alia*, making payments to earlier defrauded clients, and to finance the corporate C.E.O.'s

personal proclivities such as highly speculative commodities trading.  (*Id.* at 2075–76, 2083, 2089.)  The scenario presented had all the hallmarks of a classic Ponzi scheme.

> As to [Defendant's] professed ignorance, which she proffers would have been more palatable to the jury if they had heard from Ainbinder, that argument does not ring true given that the cognitive firepower required to readily understand what the company's banking records made obvious does not call for an accounting background.  At most, a passing grade in junior high school mathematics would suffice.  So what Defendant did, or did not do, for her former employer is largely irrelevant for present purposes.  Moreover, even if, *arguendo*, defense counsel's performance fell short of the mark by not interviewing and calling the subject witness to the stand, the record is devoid of evidence to suggest, no less establish that "but for counsel's [claimed] unprofessional errors, [there is a reasonable probability that] the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  That is particularly true when the prejudice prong of defendant's ineffective assistance claim is evaluated in the context of all of the government's proof, not just the important, but non-dominant aspect pertaining to her bookkeeping experience.  So viewed, the evidence against her was overwhelming and, accordingly, the likelihood of [Defendant's] conviction being disturbed on appeal upon the ground advanced does not fall within the ambit of reasonable probability.

(*Id.*)

Moreover, the Court itself reviewed a letter from Ainbinder that was submitted in Defendant's support at sentencing, which stated that Defendant purportedly "did not possess the skills to understand basic financial information [and that] [s]he never prepared an income statement or balance sheet [nor did she have] any common knowledge concerning general ledgers [or] the skills necessary to analyze an account or perform fundamental accounting tasks." (Ainbinder Decl. [ECF No. 480-3] ¶ 4.)  The Court explained during Defendant's sentencing that "given the sum total of what is before me, for the reasons I have indicated, I find that clearly the jury has concluded she had the requisite intent as of that date alleged in Count Eight, and I find beyond that via her role as the bookkeeper, among other things, that she had the requisite intent from the time she started marketing these securities."  (Tr. of Criminal Cause for Sentencing

[ECF No. 525-1] at 27.)

The Second Circuit has explained that "[c]ourts applying *Strickland* are especially deferential to defense attorneys' decision concerning which witnesses to put before the jury." *Greiner v. Wells*, 417 F. 3d 305, 323 (2d Cir. 2005). "'The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess.'" *Id.* (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam)) (alterations in original). It is not, however, a question of strategy if an attorney refuses to interview a witness in preparation for trial. *Lopez v. Miller*, 915 F. Supp. 2d 373, 427 (E.D.N.Y. 2013) ("[I]t is well-established that the refusal even to interview a witness with potentially exculpatory information cannot be considered 'strategic' and thus generally constitutes deficient performance").

Here, Defendant claims that her trial counsel never interviewed Ainbinder, despite her "repeated requests that they do so." (Def.'s Mem. in Supp. at 20.) However, even if Defendant can make out the deficient performance prong of *Strickland*, she cannot establish prejudice. As the Court already explained in its December 6, 2016 Order, "the evidence against her was overwhelming and, accordingly, the likelihood of [Defendant's] conviction being disturbed on appeal upon the ground advanced does not fall within the ambit of reasonable probability." (Order Denying Defendant's Motion to Modify the Conditions of Her Release at 2.) Defendant has not presented any new evidence on this motion that disturbs the Court's previous holding. Accordingly, the Court denies Defendant's § 2255 motion for ineffective assistance of counsel on this first ground.

B.  Stipulation to the Admissions of Defendant's Draft Resume

Defendant claims that her trial counsel's stipulation to the admission of her draft resume

for the truth of its contents undermined her defense that she was unaware of the fraud and permitted the government to argue that "her 'accounting' (actually, simple bookkeeping) experience and 'business' (actually, marketing) degree would have made her aware of it." (Def.'s Mem. in Supp. at 1.)  Defendant elaborates that "[t]rial counsel missed the appropriate hearsay objection entirely" and that their "failure to object to the admission of damaging and objectionable hearsay evidence fell well 'below the objective standard of reasonableness' required by *Strickland*."  (*Id.* at 29–30.)

Defendant's resume that was read into the record for the truth of its statements, was originally attached to an e-mail that was seized pursuant to a search warrant issued for Defendant's e-mail account.  (Tr. at 2078–79.)  As the e-mail was sent by Defendant, it was admissible for its truth as a statement of a party-opponent under Fed. R. Evid. 801(d)(2)(A).  *See, e.g.*, *United States v. Gasperini*, 2017 WL 3140366, at *5 (E.D.N.Y. July 21, 2017) ("emails sent by Defendant are admissible for their truth as statements of a party-opponent"); *Cobbs v. City of Newburgh – City Council*, 2012 WL 12884367, at *3 n.6 (S.D.N.Y. Nov. 19, 2012) ("Evans' e-mail to McGrane is almost certainly admissible as an opposing party's statement under Federal Rule of Evidence 801(d)(2)(D)); *Columbia Casualty Co. v. Neighborhood Risk Management Corp.*, 2016 WL 4467548, at *5 n.1 (S.D.N.Y. Aug. 22, 2016) (noting that an e-mail from Defendant's insurance consultant explaining the original intent of a buyout clause was *not* inadmissible hearsay, but rather an admissible opposing party statement under Fed. R. Evid. 801(d)(2)(D)); *Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 529 n.19 (S.D.N.Y. 2016) (explaining that statement by the founder of the plaintiff's predecessor in interest "in emails, blog posts, and correspondence offered by the [] defendants are admissible as statements by a party-opponent" pursuant to Fed. R. Evid. 801(d)(2)).

Curiously, Defendant has attached text messages between herself and her original counsel to her Memorandum in Support of her § 2255 Petition, in which Defendant wrote that "[t]he only reason they [the government attorneys] have my resume is bc [because] my gf [girlfriend] was helping me write one. That's what they [sic] going by. But it was only a draft[.]" (Def.'s Text Messages, Ex. 5 to Def.'s Mem. in Supp. [ECF No. 520-5] ¶ 200.) As such, Defendant has only further admitted to her own involvement in composing the resume, so she cannot possibly claim that the resume was drafted by someone else and included false representations about her prior work experience.

Based on the foregoing, Defendant cannot prove either deficient performance or prejudice. Defendant herself has conceded that she helped draft the resume, and the e-mail it was attached to was otherwise admissible as an opposing party statement. Thus, there is no reasonable probability of a different result had her trial counsel *not* stipulated to its admission. The Court further notes that it also considered and rejected this argument in its December 6, 2016 Order and found that there was no prejudice because the evidence against her was overwhelming. Accordingly, Defendant's motion is denied on this second ground.

C. Failure to Object to Testimony About Defendant's Resume and Transcript

Defendant challenges her trial counsel's failure to object to testimony about the contents of her draft resume and her college transcript, "despite the witness's lack of personal knowledge about her education and experience[.]" (Def.'s Mem. in Supp. at 1.) However, this argument is unpersuasive because the witness, Luciano, simply read from the resume and transcript. In fact, Defendant's trial counsel confirmed with Luciano that she "testified . . . or actually I should say you read from various documents yesterday" and then went on to clarify that Luciano had "no personal knowledge of [Defendant's] intellect or anything like that from her college days." (Tr.

at 2316.) Defendant does not contest the admission of her transcript, and her argument against the admission of her resume has already been rejected. Thus, Luciano was merely reading into the record evidence that was admissible. Defendant does not claim, nor could she claim, that Luciano testified about the contents of Defendant's resume, Defendant's proficiency, any details about Defendant's experience that were not included in the documents, or Defendant's financial acumen. Instead, Defendant takes issue with trial counsel's failure to specifically ask Luciano whether she had personal information about Defendant's work experience as opposed to just her intellect and "anything about her college days." (Def.'s Mem. in Supp. at 32 (quoting Tr. at 2316).) There was nothing in the record to suggest that Luciano had personal knowledge about Defendant's resume and/or transcript as Luciano merely read what was written in the documents without further extrapolating. Accordingly, the Court is unpersuaded that trial counsel's performance was deficient, nor was it prejudicial in the face of the overwhelming evidence against Defendant. The motion is denied on this third ground.

D. Failure to Introduce E-mails Between Defendant and Cosmo

Defendant avers that her trial counsel erred by failing to introduce e-mails she sent to Cosmo that allegedly "established [Defendant's] consciousness of innocence, unawareness of the fraud, and her lack of financial sophistication[.]" (Def.'s Mem. in Supp. at 1.) Defendant points to six e-mails that she believes should have been introduced. (*Id.* at 34–35.) They are as follows:

(1) The first e-mail, dated November 29, 2007, concerns a new product. Defendant asks Cosmo if she can "take 10 min of your time so u can help me go over how to explain it to clients. I understand the conceot [sic], but I just want to make sure I am explaining it right." (E-mail from Def. to Cosmo, Ex. F to Creizman Decl. at 1.)

(2) The second e-mail, dated December 10, 2007, concerns a contract that Agape was offering its investors that was not at issue during the trial. Defendant wrote Cosmo a series of questions about the contract fee, the termination fee, and whether clients can add

more money during the contract term.  (E-mail from Def. to Cosmo, Ex. G to Creizman Decl. at 1.)

(3) The third e-mail, dated October 22, 2008, concerns a new insurance product (the "protection plan"), that Agape was offering its investors.  Defendant sent an e-mail to Cosmo asking who held the policy and saying that she was confused.  (E-mail from Def. to Cosmo, Ex. H to Creizman Decl. at 1–2.)

(4) The fourth e-mail, dated November 19, 2008, concerns a change in the way Agape was allegedly using client money to invest in funds (purportedly pooling money and investing in seven loans as opposed to investing in a specified loan).  Defendant e-mailed Cosmo to inquire about how and when the money would be deposited, and how to explain it to clients.  (E-mail from Def. to Cosmo, Ex. I to Creizman Decl. at 1–2.)

(5) The fifth e-mail, dated December 3, 2008, concerns a discrepancy in the rates. Defendant asks Cosmo "I have clients that get other rates other than 4% a month. How am I giving them the rate and same as for anyone whom I give me [sic] commission of 16% too.  How is that being calculated when the contract says 4% a month?"  (E-mail from Def. to Cosmo, Ex. J to Creizman Decl. at 1.)

(6) The sixth and final e-mail, dated December 3, 2008, concerns a question from a client as to what would happen to the client's quarterly distribution if the "contract goes bad." (E-mail from Def. to Cosmo, Ex. K to Creizman Decl. at 1.)  Defendant copied her client's question into her e-mail and then wrote to Cosmo that she had already asked what would happen, and that she guessed that her client wanted "a more specific answer." (*Id.*)

In reviewing these e-mails in detail, the Court finds that the first, third, and fourth e-mails concern a new product or a change in business practices.  It is unremarkable that Defendant would have questions when new products were introduced or when Agape shifted its investment model.  Thus, these three e-mails do not provide any insight into Defendant's state of mind,[1] nor

---

[1] These e-mails are inadmissible hearsay if introduced as to the truth of their contents.  While "[a] defendant's out-of-court statement is not hearsay when offered by the Government.  Fed. R. Evid. 801(d)(2)(A). . . .  [ ] a defendant does not have a parallel ability to offer his own out-of-court statements into evidence."  *United States v. Annabi*, 2012 WL 48911, at *1 (S.D.N.Y. Feb. 14, 2012) (finding that a defendant could not admit certain e-mails he had himself sent because they were inadmissible hearsay); *see also United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay and is not admissible.").  Thus the e-mails could only be introduced to establish Defendant's state of mind as to her "motive, intent, or plan" under Fed. R. Evid. 803(3), but none of them viewed singularly, or all of them together, suggest that Defendant did not fully understand the subject fraud of which she was a willing and knowledgeable participant.

do they give rise to a "reasonable probability" that there would have been a different result had they been introduced.  The second e-mail concerns a product that was not at issue in the trial, so it is irrelevant.  This leaves only the fifth and sixth e-mails.  Notably, both of these e-mails were sent after Defendant received the November 3, 2008 from Cosmo stating that Agape was "now on extension/default on every loan we did last year."  The sixth e-mail relates to this shift in Agape's financial situation because it pertains to a question from a client as to what would happen to his quarterly distributions on a bad contract.  Again, it is not surprising that Defendant would have questions about how Agape would make quarterly distribution payments given that all the loans were in default and Agape no longer had the money to pay her commission checks.  As to the fifth e-mail, the fact that she was asking for details about the intricacies of the fraud does not bolster her argument that she was unaware it was being perpetrated, especially in light of the fact that it was sent after Cosmo's November 2008 e-mail alerting employees that Agape was in dire financial straits.  There is no probability—let alone a reasonable one—that this single e-mail standing alone against the sea of proof demonstrating Defendant's culpability would have led to a different result.  Therefore, there was no prejudice to Defendant and her motion is denied on this fourth ground.

> E.  Failure to Object to Expert Testimony About Securities

Defendant claims that her trial counsel failed to object to improper testimony by the government's expert witness, Arthur Laby ("Laby"), that Agape's bridge loan contracts were "securities," which she asserts "was an opinion on an ultimate issue, and also usurped the Court's role to instruct the jury[.]"  (Def.'s Mem. in Supp. at 1.)

Under Fed. R. Evid. 704, an expert opinion "is not objectionable just because it embraces an ultimate issue" except that "[i]n a criminal case, an expert witness must not state an opinion

about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged[.]" Fed. R. Evid. 704(a), (b). "[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see also United States v. Duncan*, 42 F.3d 97, 103 (2d Cir. 1994) (explaining that "factual conclusions . . . are not prohibited even if they embrace an ultimate issue to be decided by the jury" and finding that an agent who used the term "money laundering" and stated that "[t]here are a minimum of 20 false tax returns that involved [one] transaction alone" was merely positing factual conclusions where the defendant was charged with conspiring to impair the lawful functioning of the IRS and conspiring to commit bank fraud) (internal quotation marks omitted).

Here, trial counsel objected to Laby's testimony before he took the stand and even moved to preclude him as a witness on the basis that he should not be permitted to testify as to the "ultimate question, that is, whether . . . this particular contract qualifies as a security or not." (Tr. at 2810–14.) The Court allowed Laby to proceed over trial counsel's objection. Laby then went on to testify that that he had no doubt that the instrument in question, an Agape bridge investment, was a security "because it falls within the definition of something called an investment contract." (Tr. at 2831.) After explaining the relevant legal test set forth in *S.E.C. v. Howey*, 328 U.S. 293 (1946), and stating that in reaching his conclusion he considered *inter alia* the testimony of two government witnesses, Laby then reiterated that "there is really no question in my mind whether they meet the requisite standard." (Tr. at 2832–2853.) Trial counsel made no further objections to Laby's testimony.[2]

As an initial matter, Defendant has not established that Laby violated Fed. R. Evid.

---

[2] The Court notes that under Fed. R. Evid. 103(b), trial counsel was not required to object to Laby's testimony a second time to preserve this ground for appeal.

704(b) because he did "not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged[.]" Moreover, the Court instructed the jury that it could ignore Laby's testimony when deciding whether the investment contracts were securities, and the jury still concluded that the investment was a security. (*See* Tr. at 2853–54.) Putting aside whether counsel's performance was deficient for failing to object to Laby's testimony a second time, Defendant cannot prevail because the record is devoid of evidence to suggest that "the result of the proceeding would have been different" if trial counsel had done so and succeeded. *Strickland*, 466 U.S. at 694. Therefore, Defendant's motion is denied on this ground.[3]

### F. Failure to Object to Argument About Defendant's Omissions

Defendant further challenges her trial counsel's failure to object to the government's argument to the jury that Defendant's purported omissions to investors "were sufficient to convict her of fraud without establishing that [Defendant] had a duty to disclose the omitted information[.]" (Def.'s Mem. in Supp. at 1.) Specifically, Defendant takes issue with trial counsel's failure to object to two of five "lies" that she told investors. The five lies were as follows: (1) that Defendant told investors the investments went to fund bridge loans; (2) that Defendant told investors that bridge loans were successfully closing when they were in fact in default; (3) that Defendant did not disclose to investors that Agape's account representatives were not receiving commissions in 2008, and that the company had asked employees to lend Agape money; (4) that Defendant told investors that the interest rates Agape charged borrowers could support investors' returns; and (4) that Defendant failed to tell investors about Cosmo's prior conviction for fraud. (*Id.* at 42 (quoting Tr. at 2923).) Defendant takes issue with the third

---

[3] Defendant's related complaints about the Court's jury instructions are inapposite on a Section 2255 motion for ineffective assistance of counsel and will not be addressed.

and fifth "lies," which she asserts were omissions of information that she had no duty to disclose. (*Id.*)

"While 'there is no general fiduciary duty inherent in an ordinary broker/customer relationship,' 'a relationship of trust and confidence does exist between a broker and customer with respect to those matters that have been entrusted to the broker." *United States v. Skelly*, 442 F.3d 94, 98 (2d Cir. 2006)(internal citations omitted). "Most commonly, this relationship exists in situations in which a broker has discretionary authority over the customer's account, but we have recognized that particular factual circumstances may serve to create a fiduciary duty between a broker and his customer even in the absence of a discretionary account." *Id.* (internal citations omitted). Brokers also have "an affirmative duty . . . to use reasonable efforts to give [the customer] information relevant to the affairs that [have] been entrusted to them." *United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999)) (internal quotation marks omitted, alterations in original).

Here, Agape's financial hardships and Cosmo's fraud conviction seem to be information relevant to the affairs entrusted to Defendant in her role as an account representative. This is bolstered by the evidence presented at trial that certain of Defendant's clients said they trusted her to provide them with this type of information, and that they would not have invested or continued to invest with Agape if they had known. (Tr. at 530–33, 2031, 2040–41, 2046.) However, once again, the Court need not determine whether counsel's performance was deficient for failing to object to two of five "lies," or if Defendant had an affirmative duty to disclose Agape's dire financial issues and Cosmo's fraud conviction. Here, as with Defendants' other claims, she wholeheartedly fails on the second prong. There is no evidence that trial counsel's failure to object to two omissions prejudiced Defendant in the face of three other lies that

Defendant does not dispute. Defendants' "lies" that (1) the investments went to fund bridge loans, (2) the bridge loans were successfully closing when they were in fact in default, and (3) the interest rates Agape charged borrowers could support investors' returns are three affirmative misrepresentations that were a sufficient basis for her fraud conviction, with or without the two omissions and a duty to disclose such information. *See United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("The fraud statutes are violated by affirmative misrepresentations *or* by omissions of material information that the defendant has a duty to disclose") (emphasis added). The evidence at trial showed that based on Defendant's time as Agape's bookkeeper, her review of loan binders when she became an account representative, and her role managing incoming funds, she had the information necessary to know that these statements were affirmative misrepresentations. As such, Defendant cannot demonstrate prejudice and her motion is denied on this sixth ground.

G. Failure to Introduce E-mails Demonstrating Defendant's Disclosures

Defendant claims that her trial counsel failed to introduce e-mails demonstrating that she "disclosed the very information to investors that the government alleged she had omitted[.]" (Def.'s Mem. in Supp. at 1.) This argument is effectively moot given that the Court has already rejected Defendant's related argument challenging trial counsel's failure to object to the inclusion of the two omissions or to hold the government to its burden of establishing that Defendant had an affirmative duty. Defendant points to *two* e-mails in which she told investors about Cosmo's conviction. First, these e-mails solely address one of the two omissions. Second, these two isolated e-mails do little—if not nothing at all—to refute that Defendant failed to disclose Cosmo's conviction to the majority of her clients. Finally, and most importantly, Defendant cannot show prejudice from trial counsel's failure to introduce these two e-mails

given that the Court has already found that the evidence against her was overwhelming based on her affirmative misrepresentations.  Thus, Defendant's motion is denied on this seventh ground.

H.  Failure to Move for a Change of Venue

Defendant argues that her trial counsel should have moved for a change of venue, "given that the Agape fraud was highly publicized in the press as the largest Ponzi scheme in the history of Long Island and according to the government's own words, was 'particularly egregious because the typical victims of the Agape offense were hard-working, middle-class Long Islanders who were looking to make a better life for themselves and their families[.]'"  (Def.'s Mem. in Supp. at 1.)  Defendant states that "[w]ith a jury pool drawn from the very Long Island community impacted by the scheme, trial counsel should have anticipated that [Defendant] would be prejudiced, and should have moved pretrial to change the venue."  (*Id.* at 46.)

"The Sixth Amendment secures to criminal defendants the right to a trial by an impartial jury."  *Skilling v. United States*, 561 U.S. 358, 377, 120 S.Ct. 2896, 177 L.Ed.2d 619 (2010). While the Constitution provides that a criminal trial should be held in the state and district where the crime was committed, *see* U.S. Const. art. III, § 2, cl. 3, "[t]he Constitution's place-of-trial prescriptions . . .do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'"  *Skilling*, 561 U.S. at 378, 130 S.Ct. 2896 (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)).  When a defendant raises a constitutional venue challenge before jury selection, he or she "must make a showing of presumed prejudice, arising when 'prejudicial publicity so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community.'"  *United States v. Ayala*, 64 F. Supp. 3d 446, 449 (E.D.N.Y. 2014) (quoting *United States v. Volpe*, 42 F. Supp. 2d 204,

216 (ED.N.Y. 1999)).  "A presumption of prejudice, [the Supreme Court's] decisions indicate, attends only the extreme case[.]"  Cases where adverse pretrial publicity warrants a presumption of prejudice "are very rare, however, and have been characterized . . . as 'extreme situation[s].'" *United States v. Sabhnani*, 599 F. 3d 215, 233 (2d Cir. 2010) (quoting *United States v. Campa*, 459 F.2d 1121, 1143 (11st Cir. 2006) (en banc)).  In fact, in most cases, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial[,]" *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), and "[s]ubstantial publicity alone is not enough to require a change of venue[,]" *United States v. Stevens*, 83 F.3d 60, 66 (2d Cir. 1996).

In evaluating a pre-trial motion to change venue, the court should consider, *inter alia*, "the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear evidence impartially."  *Ayala*, 64 F. Supp. 3d at 450 (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990)) (internal quotation marks omitted). Finally, while jurors should be impartial they do not need to be "totally ignorant of the facts and issues involved."  *Murphy v. Florida*, 421 U.S. 794, 799–800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *see also Ayala*, 64 F. Supp. 3d at 450 (noting that *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1962) "stands alone as the only one in which the Supreme Court has 'found presumptive prejudice deriving solely from pretrial publicity.'")

In support of her motion, Defendant states that Agape was the "subject of considerable negative press in the Long Island Business News."  (Def.'s Mem. in Supp. at 46.)  Defendant further points out that one prospective juror was dismissed during jury selection because he had

"direct contact with the case" as he had worked for "one of the mediators on the Agape case," while another juror was dismissed during the trial after he realized that someone at Agape had solicited him to be a local sponsor of a lacrosse team from a sports complex that Cosmo was planning to develop that left "a bad taste in [his] mouth." (Tr. at 211–12, 2186–90.) Defendant provides no further examples of prejudice, nor does she claim that any of the press accounts mentioned her personally or that the government was responsible for any part of it. Notably, no jurors or potential jurors claimed that they or anyone they knew were victims of the Agape Ponzi scheme. Rather, one was a mediator and another had contact with Cosmo in an unrelated capacity. As the Supreme Court has explained, substantial publicity is not enough and jurors need not be entirely ignorant of the facts of a case. *Murphy*, 421 U.S. at 799–800, 95 S.Ct. 2031, 44 L.Ed.2d 589. Accordingly, Defendants allegations are insufficient to suggest that she was entitled to a change of venue or that her counsel's performance was either deficient or prejudicial for failing to move for one. Defendant's § 2255 motion is denied on this ground eight.

I. Counsel's Purported Conflict of Interest

Finally, Defendant avers that her trial counsel "operated under an obvious and unwaivable conflict of interest because immediately after the arrest of Nicholas Cosmo, the architect of the fraud, [Defendant's] counsel advised her that she could deposit commission checks she had received, which the government used to establish her consciousness of guilt at trial." (Def.'s Mem. in Supp. at 1–2.) Defendant elaborates that her counsel could not pursue a "plausible alternative defense strategy" of advice-of-counsel to undermine the government's argument that she deposited the checks because she knew of the fraud and was trying to draw out whatever money she could, as it was "inherently in conflict with his own interest in self-preservation." (*Id.* at 48 (quoting *LoCascio v. United States*, 395 F.3d 51, 56 (2d Cir. 2005)).)

"It is well-established that 'a defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel.'" *United States v. Cohan*, 798 F.3d 84, 88 (2d Cir. 2015) (quoting *LoCascio*, 395 F.3d at 56). To protect that right, courts have an obligation to "initiate an inquiry whenever it is sufficiently apprised of even the possibility of a conflict of interest," and, if necessary to hold a *Curcio* hearing for the purpose of "disqualify[ing] counsel or seek[ing] a [conflict] waiver from the defendant whenever it reveals that there is an actual or potential conflict." *Cohan*, 798 F.3d at 84 (quoting *United States v. Rogers*, 209 F.3d 139, 143 (2d Cir. 2000)). "This inquiry is often called the '*Sullivan* inquiry' in reference to the Supreme Court's directive in *Cuyler v. Sullivan* that a trial court should investigate when it 'knows or reasonably should know that a particular conflict exists.'" *Amato v. United* States, at 2017 WL 1293801, at *13 (E.D.N.Y. Apr. 6, 2017) (quoting *Cuyler*, 446 U.S. 335, 347, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

If "defense counsel was 'burdened by an actual conflict of interest'" then defendant is entitled to a "limited presumption of prejudice." *Torres v. Donnelly*, 554 F.3d 322, 325 (2d Cir. 2009). An "actual conflict of interest" means "a conflict that affected counsel's performance[.]" *See Mickens v. Taylor*, 535 U.S. 162, 171 (2002). "An actual conflict 'adversely affects counsel's performance' if 'some plausible alternative defense strategy or tactic might have been pursued, and the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" *Curshen v. United States*, 596 F. App'x 14, 16 (2d Cir. 2015) (summary order) (quoting *United States v. Schwarz*, 283 F.3d 76, 92 (2d Cir. 2002)). For purposes of the "adverse effect" analysis, a "plausible [alternative] defense strategy is a strategy that could have been pursued even if, in all likelihood, it would have failed." *Curshen*, 596 F. App'x at 16 (citing *Schwarz*, 283 F.3d at 92). Nevertheless, Defendant retains the burden of

showing "causation"—which is to say that the defendant must show that "trial counsel chose not to undertake [the alternative defense strategy] <u>because</u> of his conflict." *LoCascio*, 395 F.3d at 56.

If the defendant fails to establish that counsel's performance was affected by an actual conflict of interest, then the court can find that there was a potential conflict of interest. *Amato*, 2017 WL 1293801, at *15. "[P]otential conflicts of interest arise if 'the interests of the defendant may place the attorney under inconsistent duties at some time in the future.'" *Martinez v. Kirkpatrick*, 486 F. App'x 158, 160 (2d Cir. 2012) (quoting *United States v. Kliti*, 156 F.3d 150, 153 n.3 (2d Cir. 1998)). Unlike actual conflicts, potential conflicts do not impart a presumption of prejudice; "to succeed on an ineffectiveness claim based on a potential conflict, [the defendant] bears the burden of satisfying *Strickland*'s 'performance and prejudice' test." *Amato*, 2017 WL 1293801, at *15 (citing *Tueros v. Greiner*, 343 F.3d 587, 592 (2d Cir. 2003)).s

Defendant's final argument, like the preceding eight, is unavailing. Defendant fails to note in her papers that the counsel who she was working with when her case commenced and who advised her to deposit the checks (Michael Schwed) was not the counsel who represented her at trial (David Zucker). (*See* Def.'s Mem. in Supp. at 4 (explaining that Mr. Schwed was Defendant's attorney at the pre-trial stage).) While Mr. Schwed and Mr. Zucker are partners, Mr. Schwed was not involved in Defendant's trial. In fact, the Court held a *Curcio* hearing on November 4, 2014, to inform Defendant that there may be a conflict of interest in Mr. Zucker representing her because Mr. Schwed could be called as a witness in the event that a triggering event occurred and her proffer statements were sought to be introduced by the prosecution. (Minute Entry for *Curcio* Hearing [ECF No. 236] at 1.) Defendant was present at the *Curcio* hearing with *Curcio* counsel and she expressed to the Court that she wished to proceed to trial

with Mr. Zucker all the same. (*See id.*)

While advice-of-counsel may have been an alternative defense strategy, Mr. Zucker's decision not to pursue it does not appear to stem from conflict or self-interest, but rather from the decision to avoid calling Mr. Schwed as a witness and the potential of opening Mr. Schwed to cross-examination. To the extent that Mr. Schwed provided Defendant with an explanation as to why she should deposit the checks that related to her prior conduct or her knowledge of Agape's finances, it may have opened the door for the government to inquire into their discussion and potentially any related matters. Therefore, even if Mr. Zucker had an actual conflict—which the Court does not believe he did—Defendant has not shown causation and cannot prevail on the ground urged. *See LoCascio*, 395 F.3d at 56. If Mr. Zucker did not have an actual conflict, then there is only a potential conflict, and Defendant must establish both deficient performance and prejudice. Given the aforementioned risks in calling Mr. Schwed to the stand, Mr. Zucker's performance was not deficient. Likewise, there was no prejudice to Defendant because there was overwhelming evidence of her *mens rea* even without the government's argument about the cashed checks. Therefore, Defendant's motion is denied on this ninth and final ground.

J. The Claims in the Aggregate

The Second Circuit has explained that a court need not "decide whether one or another or less than all of the[] errors would suffice, because *Strickland* directs [courts] to look at the 'totality of the evidence before the judge or jury,' keeping in mind that '[s]ome errors [] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture . . . .'" *Lindstadt*, 239 F.3d at 199 (quoting *Strickland*, 466 U.S. at 695–96, 194 S.Ct. 2052). Here, not a single one of Defendant's nine claims suggest ineffective assistance of counsel. Even if viewed in their totality, that conclusion remains unchanged.

## CONCLUSION

For the reasons set forth above, Defendant's § 2255 motion for ineffective assistance of counsel is denied.  The Clerk of Court is directed to close Case No. 17-CV-7336.

**SO ORDERED.**

Dated: Central Islip, New York
      October 15, 2019                              /s/ Denis R. Hurley
                                                            Denis R. Hurley
                                                            United States District Judge